AO 91 (Rev. 11/11)  Criminal Complaint

FILED
United States District Court
Albuquerque, New Mexico
Mitchell R. Elfers
Clerk of Court

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| | |
|---|---|
| United States of America<br>v.<br>**RYDELL HAPPY**<br><br>*Defendant(s)* | Case No. 24-MJ-615 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **April 24, 2024** in the county of **San Juan** in the
District of **New Mexico**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1153, 1111 | Murder in the Second Degree in Indian Country |

This criminal complaint is based on these facts:
See Affidavit, which is attached and incorporated fully by reference herein.

☒ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Tyler Rackham
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 28, 2024

_____
*Judge's signature*

City and state: Albuquerque, New Mexico

Jennifer M. Rozzoni, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Tyler Jack Rackham, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed with the FBI since January 2020. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent with statutory arrest authority charged with conducting criminal investigations of alleged violations of federal criminal statutes, including Title 18 of the United States Code. Prior to my employment by the FBI, I was a Law Enforcement Officer in the State of Utah for six years. I am presently assigned to the Farmington Resident Agency (RA), Albuquerque Division, where my duties include investigating violations of Federal law, specifically those violations occurring on the Navajo Indian Reservation.

2. I have received training and gained experience in the investigation and enforcement of major crimes including murder, firearms offenses, and other federal crimes. Additionally, I have received training and experience in interview techniques, arrest procedures, search warrant applications, the execution of searches and seizures, and various other criminal laws and procedures. I have previously participated in investigations within Indian Country involving the crimes enumerated below.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. Because this affidavit is submitted for the limited purpose of securing a criminal

complaint, I have not included each and every fact known to me concerning the investigation. I have set forth only those facts that I believe are necessary to establish that probable cause to support a criminal complaint as explained below.

4.      This affidavit is being submitted in support of a criminal complaint charging Rydell Happy (**HAPPY**) with one count of murder in the second degree, in violation of 18 U.S.C. §§ 1153 and 1111.

## RELEVANT STATUTES

5.      18 U.S.C. § 1153(a), in relevant part, states: "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, . . . a felony assault under section 113 . . . shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

6.      18 U.S.C. § 1111(a) states: "Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect

the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree."

## PROBABLE CAUSE

7.     At 10:05 p.m. on April 24, 2024, Navajo Nation Police Department (NNPD) was notified that there were shots fired near United States (U.S.) Highway 491 near milepost 40, which is within the exterior boundaries of Navajo Nation. Officers made contact with P.D., the reporting party. P.D. stated he/she was traveling south on U.S. Highway 491 returning from Utah. P.D. pulled his/her vehicle over on the shoulder of the road so P.D.'s child and grandchildren could get out of the vehicle and stretch their legs. During this time a white SUV parked behind P.D.'s vehicle.

8.     P.D. and his/her family returned to their vehicle and traveled south. The white SUV began to follow P.D. and eventually rear ended P.D.'s vehicle. P.D. was scared and heard loud pops that sounded like gunfire. P.D. told his/her grandchildren to get down. The white SUV continued to pursue P.D. and eventually pulled up next to P.D.'s vehicle. P.D. observed more gunfire and perceived it was coming from the front passenger of the white SUV. The white SUV later collided with the left side of P.D.'s vehicle. P.D. was eventually able to pull off the highway to a residence to get help.

9.     Investigators also interviewed P.D.'s adult child, M.S. who was also in the vehicle. M.S. stated they had pulled over on the side of the road when a vehicle approached and parked behind their car. M.S. described the vehicle as a white SUV with the front passenger headlight out. M.S. got back in their vehicle with everyone else and they began traveling south. The white SUV followed and ran into the back of the vehicle M.S. was

3

riding in. M.S. heard loud popping and believed their vehicle was being shot at. The white SUV pulled up to the left side and M.S. saw a male passenger pointing an object outside his window and firing toward M.S.'s vehicle. M.S. stated they eventually pulled off the highway toward a residence to get help.

10. Responding NNPD officers inspected P.D.'s vehicle and observed three bullet holes in the trunk lid of the car, one bullet hole on the driver's side door and window, and one bullet hole on the left rear passenger window.

11. Following this information, NNPD officers in the area were on the lookout for a white SUV with a headlight out. Officers later observed a white SUV with a front headlight out traveling south on US Highway 491. Officers pursued the vehicle, which appeared to be making attempts to evade the officers. While following the white SUV, officers observed the occupants of the white SUV throwing items out of the vehicle. The white SUV eventually crashed. Officers took into custody three individuals who were in the vehicle, later determined to be **HAPPY**, **Witness 1**, and **Witness 2**.

12. Officers took photographs of the white SUV and observed what appeared to be .22 caliber shell casings, cell phones, a pellet gun, and what appeared to be blood on the driver's side floorboard. The white SUV was a Toyota Highlander.

INTERVIEW OF WITNESS 1

13. **Witness 1 ("W1")** was interviewed on April 26, 2024, and stated **W1** was an enrolled member of Navajo Nation. **W1** was provided a *Miranda* warning and **W1** agreed to speak with investigators. **W1** initially began to provide statements to law enforcement that told a similar story to statements made by **Witness 2 ("W2")** and

4

**HAPPY** as outlined below. After further questioning, however, **W1** changed **W1's** story and told investigators **W1** was going to tell the truth about what happened.

14. **W1** then explained that **W1** was recently released from custody on unrelated charges when **W1** contacted **HAPPY** using Facebook messenger asking to be picked up. **HAPPY** and **W2** then picked up **W1** near a 711-convenience store at approximately 5:00 am on April 24th. At some point during the day, **HAPPY**, **W1,** and **W2** picked up another individual (JOHN DOE) whom **W1** had never met before. **W1** noted that **HAPPY** seemed to know JOHN DOE. During the time they were in Gallup, **HAPPY** asked **W2** to purchase him a firearm. **W2** then purchased a black revolver for **HAPPY**.

15. **W1** stated that throughout that day, the group participated in criminal activity at the direction of **HAPPY**, including, but not limited to, a shooting of an individual that occurred in Gallup, New Mexico, earlier that same day, and the above referenced shooting of P.D.'s vehicle that occurred within the exterior boundaries of Navajo Nation. **W1** admitted that **W1** was the one who shot the victim in Gallup but stated that **W1** was told to do the shooting by **HAPPY**.

16. Regarding the shooting that occurred on Navajo Nation, **W1** stated **W1** was riding in the back seat of the vehicle with **W2**. JOHN DOE was driving and **HAPPY** was in the front passenger seat. They were driving down the road when they saw a vehicle. They approached the vehicle and at some point, **HAPPY** began shooting at the car and its occupants.

17. **W1** explained that after the shooting incident, **HAPPY** began to argue with JOHN DOE. At one point **HAPPY** told the group to get out of the car. JOHN DOE,

5

**HAPPY**, **W1**, and **W2** all exited the vehicle. **W1** heard **HAPPY** tell JOHN DOE to get on his knees. JOHN DOE got on his knees and **HAPPY** shot him with the revolver. After shooting JOHN DOE**,** **HAPPY** grabbed a baseball bat and began hitting JOHN DOE in the head repeatedly. **W1** told investigators where the body of JOHN DOE could be recovered. **W1** also drew a map of the area to assist in finding JOHN DOE.

18.  On April 27, 2024, **W1** was interviewed again by investigators. **W1** provided additional details regarding the suspected homicide. **W1** stated that after **HAPPY** directed JOHN DOE to get on his knees, JOHN DOE began to beg for his life. **HAPPY** began laughing and pulled the trigger on the firearm. The firearm did not discharge but **W1** heard the gun click. HAPPY continued to laugh and pulled the trigger multiple times until the gun finally discharged, shooting JOHN DOE. **W1** also noted that after the killing **HAPPY** asked **W1** to drag the body over the edge of a cliff. **W1** helped **HAPPY** drag the body and push it over the edge. **W1** also stated that **HAPPY** had thrown the baseball bat and the gun out of the window of the car prior to being taken into custody by NNPD.

INTERVIEW OF WITNESS 2

19.  On April 26, 2024, investigators interviewed **Witness 2 ("W2")** regarding the aforementioned events. In a post-*Miranda* statement, **W2** told investigators that **W2** was with **HAPPY** and **W1** in Gallup earlier that day. **W2** was driving **W2's** white Toyota SUV north from Gallup with **HAPPY** and **W1**. **HAPPY** and **W1** were passed out in the back seat. **W2** stopped and picked up a hitchhiker. **W2** told investigators the hitchhiker eventually pulled a knife and made **W2** move to the passenger side of the vehicle. The hitchhiker got in the driver's seat and began to drive **W2**'s vehicle. The hitchhiker

eventually chased a white car and began shooting at it. When questioned regarding the gun the hitchhiker possessed, **W2** stated **W2** did not know what kind of gun it was, but described it as a black handgun. Eventually when the police came, the hitchhiker fled from the police while driving **W2's** vehicle. The hitchhiker also directed **W2** to throw things from the vehicle. **W2** stated the hitchhiker was able to jump out of the car and escape and that is why he was not found by police when **W2**, **HAPPY** and **W1** were found in the vehicle.

20.     **W2** was later questioned further regarding the firearm the hitchhiker had and **W2** advised it was a firearm **W2** had purchased earlier in Gallup at a pawnshop. **W2** stated the hitchhiker found the gun while he was driving the car. **W2** stated **W2** purchased a necklace and the firearm at the pawnshop. **W2** stated **W2** purchased the firearm because it was one **W2** had wanted for a while. **W2** said **W2** was not sure what caliber the firearm was but eventually divulged that it was a .22 caliber revolver. **W2** also purchased .22 caliber ammunition from the pawnshop. **W2** stated the pawnshop was on the east side of Gallup, but **W2** did not recall the name of the store.

                              INTERVIEW OF HAPPY

21.     On April 26, 2024, **HAPPY** was interviewed regarding the aforementioned events. In a post-*Miranda* statement, **HAPPY** advised he had been in Gallup with **W2** and **W1**. **HAPPY** had planned on meeting some friends in Gallup. **HAPPY** spent the day drinking alcohol and going to liquor stores. **HAPPY** was riding in the back seat of **W2**'s vehicle when **W2** picked up a hitchhiker. After picking up the hitchhiker, **HAPPY** passed out because of the amount of alcohol he had been drinking throughout the day. **HAPPY**

recalled being taken into custody by NNPD but stated he did not know why. **HAPPY** stated he did not know much of what happened after picking up the hitchhiker because he was passed out. **HAPPY** stated he was an enrolled member of Navajo Nation.

ADDITIONAL INVESTIGATION

22. Investigators followed the map prepared by **W1** in **W1's** first interview and found JOHN DOE deceased with severe head injuries. The area around John Doe's body had a substantial amount of blood on the ground. It appeared John Doe was likely killed and then dragged over the edge of a nearby cliff. John Doe's body dropped to the next ledge below the area where he was killed and that was where his body was discovered. Due to the amount of blood at the scene, investigators determined it would be likely that the killer would have blood on his/her clothing. Investigators also determined that the area where John Doe was recovered (at approximate GPS coordinates 36.4768434, -108.6809528), along with the believed murder site, were within the exterior boundaries of the Navajo Nation.

23. Investigators examined clothing worn by **HAPPY** when he was taken into custody and found what appeared to be a staining and spatter consistent with blood on his pants and shoes. Investigators also checked the clothing of **W1** and **W2** but did not observe any blood-like substances. Investigators did observe shoe imprints at the scene near drag marks near the body that upon initial analysis appear to resemble the tread of shoes worn by **W1**, further corroborating **W1**'s account.

24. The information **W1** provided regarding the purchase of the revolver was further corroborated when investigators responded to Southwest Jewelry Pawn Shop in

Gallup. Investigators spoke with G.H., a store employee. G.H. advised that on April 24, 2024, two males were in the store looking at firearms. G.H. noted one of the males had a tattoo on his face or neck. G.H. asked the males to provide ID but they refused and left the store. A few minutes later another individual entered the store and purchased a black .22 caliber revolver. The invidivual who purchased the revolver was **W2**. G.H. did not know that **W2** was associated with the males who were in his store minutes earlier until G.H. saw **W2** exit the store. When **W2** exited the store, W2 entered a white SUV with the same males who were in the store earlier. G.H.'s description that one of the males had a facial or neck tattoo appears consistent with **HAPPY**, who has a tattoo on the side of his face.

25. Although a .22 revolver has not yet been recovered in this investigation, Investigators have collected the purchasing paperwork from the pawnshop to identify the make, model, and serial number of the firearm purchased by **W2** and believed to have been used by **W1** and **HAPPY**.

26. In follow-up investigation, NNPD officers were notified that this same vehicle was involved in a shooting that occurred in Gallup, New Mexico, earlier that same day. Reports note that on April 24, 2024 at approximately 7:56 pm Officers responded to the area of Carbon Coal Road and US 491, where they made contact with E.L. E.L. told investigators that three males and one female had picked him/her up in a white Toyota Sequoia. The female was driving the vehicle and E.L. sat in the rear seat of the vehicle with two other males. E.L provided them $20.00 and they were going to give him/her a ride to town. At one point they tried to get additional money from E.L. E.L. did not have more money to provide them and they forced him out of the vehicle. E.L. stated the back

9

passenger then handed the front passenger a black revolver. E.L. heard someone say "shoot him in the knee cap". The male that was the front passenger then shot E.L. in the leg.[1]

## CONCLUSION

27.   Based on the above information, I submit that there is probable cause to believe that **HAPPY** violated federal law by committing the offense of murder in the second degree, in violation of 18 U.S.C. §§ 1153 and 1111, when he killed JOHN DOE with a handgun and thereafter struck his head with a baseball bat.

28.   Therefore, I respectfully request that the Court approve the attached criminal complaint and issue an arrest warrant.

29.   This complaint was reviewed and approved by Assistant United States Attorney Eliot Neal.

Tyler Jack Rackham
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this   28th   day of April 2024

The Honorable Jennifer M. Rozzoni
United States Magistrate Judge

---

[1] Although E.L.'s statement appears to place **W1** in the front passenger seat of the vehicle, this incident happened multiple hours before the vehicular shooting involving P.D. where **HAPPY** is believed to have been shooting from the front passenger seat.

10